## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| _____ ) | | |
| ) | | |
| ) | | |
| CONSUMERINFO.COM, INC., a California  ) | | |
| Corporation,  ) | | |
| ) | | |
| Plaintiff,  ) | C.A. NO.: _____ |
| ) | | |
| v.  ) | | |
| ) | | |
| DIGITAL RECEIPTS, LLC, a Delaware  ) | | |
| limited liability company,  ) | | |
| ) | | |
| Defendant.  ) | | |
| ) | | |
| _____ ) | | |

### COMPLAINT OF CONSUMERINFO.COM, INC.

Plaintiff ConsumerInfo.com, Inc. ("ConsumerInfo") alleges the following for its

Complaint against Defendant Digital Receipts, LLC ("Digital Receipts"):

### JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction under 15 U.S.C. § 1121 (Lanham Act),

28 U.S.C. § 1338 (acts of Congress related to trademarks), and 28 U.S.C. § 1331 (federal

question).

2.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 (b)(1) and (b)(2)

because the defendant resides in this district and a substantial part of the events or omissions

giving rise to the claim occurred in this district.

### PARTIES

3.      ConsumerInfo is a California corporation with a principal place of business in

Costa Mesa, California.

4.      Digital Receipts was formerly a Delaware limited liability company.  On information and belief, Digital Receipts' principal place of business was Philadelphia, Pennsylvania.   According to records of the Delaware Secretary of State, Digital Receipts fell out of good standing on June 1, 2018 for failure to pay its taxes.  Thus, pursuant to Del. Code Ann. Tit. 8 § 510, Digital Receipts' corporate charter is now void, and Digital Receipts lacks power to conduct business anywhere.

## FACTS COMMON TO ALL CAUSES OF ACTION

**ConsumerInfo's Marks**

5.      ConsumerInfo is part of the Experian corporate family, the world's leading global information services group.  ConsumerInfo is the market leader for direct to consumer online credit reports, scores, and monitoring products.

6.      ConsumerInfo recently launched a new product under the brand name CreditMatch.  The CreditMatch offering allows a consumer to find the credit card that fits her best, based on her credit score, overall credit profile, and individual preferences.

7.      The offering launched on Experian's website no later than October 2018, and ConsumerInfo is currently advertising its CreditMatch brand in paid search advertising. ConsumerInfo has also filmed and produced television commercials for the CreditMatch offering, which ConsumerInfo intends to air in heavy rotation in the immediate future.

8.      In preparation for its launch of the CreditMatch-branded product, ConsumerInfo filed two intent to use trademark applications on April 20, 2018 with the United States Patent and Trademark Office ("USPTO") for the marks:  (1) "CreditMatch," USPTO Serial No. 87886797 and (2) "Experian CreditMatch," USPTO Serial No. 87886815 (collectively the "ConsumerInfo Applications").

<u>**DIGITAL RECEIPTS' PRIOR FRAUDULENT AND EXTORTIONATE ACTIVITIES**</u>

9.      Chad Batterman is the founder and CEO of Digital Receipts.  Batterman is also the founder and CEO of Nxtbigthing, LLC ("Nxtbigthing").  Through Batterman, Digital Receipts has applied for 30 separate trademark registrations, and Nxtbigthing has applied for 14 separate trademark registrations.  Thirty of those applications claim a first use date in 2007, more than five years before either company was formed.

10.      Batterman does not apply for these registrations to protect any legitimate trademark rights.  Rather, Batterman has repeatedly lied to the USPTO to obtain spurious rights (including in the CREDITMATCH mark) that he could later use to extort payments from legitimate businesses.

*Internmatch Suit*

11.      *Internmatch, Inc. v. Nxtbigthing, LLC*, Northern District of California Docket No. 3:14-cv-05438, illustrates Batterman's practice of fabricating claims of trademark ownership to extort payments from legitimate businesses.

12.      In *Internmatch*, Batterman filed a trademark application in which he claimed Nxtbigthing had been using the INTERNMATCH trademark five years prior to Plaintiff Internmatch, Inc.'s first use.  Batterman leveraged the application to file a series of spurious take-down notices with social media providers that crippled Internmatch, Inc.'s ability to advertise online.  Batterman demanded that Internmatch, Inc. pay him $325,000 for his "rights" to the mark and to end his business-crippling harassment.

13.      After Internmatch, Inc. sued and demanded that Batterman produce documentary evidence of his prior use of the trademark, Batterman concocted an incredible tale that the evidence had been lost due to a lightning strike in August 2011, a second lightning strike in

October 2011, and a power surge in April 2015.  After a thorough review of Batterman's

evidence and testimony, Judge Tigar concluded that Batterman lied under oath to support his

spurious trademark claims:

> Batterman's story about the power outage simply is not plausible
> … The inconsistencies within his insurance claims, and between
> his deposition testimony and his filed claims, strengthen the
> conclusion **that Batterman fabricated his account regarding the
> power surge**.
>
> …
>
> **The Court can only conclude that either Batterman lied under
> oath** when he stated he could not recall the name of his electrician
> or lied when submitting the invoice for electrical repairs to his
> insurer.  In either event, **Batterman's duplicitous statements**
> regarding Crooks further support the conclusion that **Batterman's
> power surge story is a pure fabrication**.

Order at (11:12-15, 15:25:28) (emphasis added).  Judge Tigar's order is attached hereto as

**Exhibit A**.

14.     As a result, Judge Tigar found Batterman had acted in bad faith, imposed an

evidence sanction, and awarded Internmatch, Inc. almost $70,000 in attorney's fees.

15.     Judge Tigar later issued a final judgment cancelling the trademark registration at

issue and permanently enjoining Batterman from claiming to any third parties he had superior

rights to the mark.[1]

---

[1] After Internmatch, Inc. stopped using the mark for reasons unrelated to the lawsuit and notified
the Ninth Circuit that it no longer wished to prosecute the case, the Ninth Circuit directed the
district court to vacate the judgment as moot.  Neither the Ninth Circuit nor Judge Tigar have
ever questioned the accuracy of Judge Tigar's findings of bad faith.

*Billhero Opposition*

16.     After the *Internmatch* suit was filed, Batterman attempted a similar fraudulent and extortionate scheme against Billhero, Inc.  The attempt at extortion led to numerous Trademark Trial and Appeal Board ("TTAB") proceedings, including Opposition No. 91233334.

17.     There, an intermediary for Billhero, Inc. contacted Batterman on June 10, 2015, with an offer to purchase the domain name billhero.com from Batterman.

18.     On July 29, 2015, unbeknownst to Billhero, Inc., Digital Receipts, through Batterman, applied for registration of the BILLHERO trademark, claiming a first use date in 2007.  After applying for the trademark registration, Batterman contacted Billhero, Inc.'s intermediary and asked him to make an offer to purchase his alleged trademark rights.

19.     Negotiations fizzled, and Billhero, Inc. filed its own trademark applications in June and October 2016.  Batterman responded by filing oppositions to Billhero, Inc.'s applications.  He also demanded $55,000 in exchange for relinquishing his alleged trademark rights.

20.     During the opposition proceedings, Batterman's discovery responses did not actually contain responsive or relevant information.  Rather, they alluded multiple times to the fact that Billhero, Inc.'s unwillingness to settle did not make "business sense."

21.     After completing discovery, Billhero, Inc. moved for summary judgment on the grounds that Batterman obtained his registration through fraud.  In particular, Billhero, Inc. demonstrated that, contrary to statements Batterman had made to the USPTO under penalty of perjury, Digital Receipts had never genuinely used in commerce and/or never had a bona fide intent to use in commerce the marks EXPENSEMATCH, BILLMATCH, and BILLHERO.

22.     On May 16, 2018, the TTAB granted Billhero, Inc.'s summary judgment motion. The TTAB held that Digital Receipts had committed fraud in obtaining its trademark registrations and ordered the Digital Receipts marks at issue cancelled.

*CaseWare Opposition*

23.     At the same time Batterman was extorting Billhero, Inc., Batterman was using a trademark application he filed on behalf of Nxtbigthing for the mark IDEAMATCH to attempt to extort a payment from CaseWare International, Inc. ("CaseWare").

24.     CaseWare filed an opposition to Batterman's application on April 22, 2015. Although the public record does not disclose the dollar amount of Batterman's demands, the proceedings were suspended for nearly one year for the purposes of settlement negotiations.

25.     CaseWare has submitted its final trial brief, which argues, among other things, that Batterman never had any bona fide intention to use the IDEAMATCH mark, as evidenced by the lack of any business plans, budgets, financial information, or any capability of offering the claimed services.

26.     Nxtbigthing did not file a trial brief disputing CaseWare's arguments.  On November 20, 2018, the TTAB entered a final order refusing Nxtbighting's application to register the mark on the grounds that Nxtbigthing did not use the mark at issue prior to CaseWare's use of its mark.

*Receiptmatch Prosecution*

27.     Further demonstrating his practice of lying to the USPTO, Batterman has admitted to making false statements under oath in his prosecution of Digital Receipts' RECEIPTMATCH trademark registration.

28.     On December 26, 2012, Batterman submitted a specimen of use for RECEIPTMATCH that stated that Digital Receipts will "upload and MATCH receipts to your online accounts."  When he submitted the specimen, Batterman declared under penalty of perjury the specimens showed the marks "as used in commerce."

29.     At the time Batterman submitted this declaration, he was represented by a well-regarded law firm that currently has over 900 attorneys.  Batterman's representation by a well-qualified law firm, as well as his extensive personal experience with trademark law, compel the conclusion that Batterman fully understood the meaning of his declaration, including the term "used in commerce."

30.     On June 29, 2013, the USPTO relied on the specimen to refuse registration because the phrase "upload and MATCH receipts" appearing on the specimen indicated the mark was being used in a descriptive fashion.

31.     On May 6, 2014, Digital Receipts filed a request for reconsideration.  Batterman submitted a declaration under penalty of perjury with the request in which he admitted that

> The flyer submitted on December 27 [sic], 2012 with our initial application, which contained a reference to "match" services was created for internal purposes only and was never distributed to the public.  As stated on the flyer, the "match" services were not available, rather "coming soon."  In fact, we never offered such services.

32.     Batterman's statement that the flyer "was never distributed to the public" and that Digital Receipts "never offered such services" is irreconcilable with his earlier December 26, 2012 declaration that the flyer showed the mark as "used in commerce."  Thus, Batterman's May 6, 2014, declaration is an admission that Batterman had falsely claimed under penalty of perjury to have used a mark in commerce.

33.     Furthermore, in the initial RECEIPTMATCH application submitted on December 26, 2012, Digital Receipts, through Batterman, claimed a first use date of August 11, 2011. After receiving the descriptiveness refusal, Batterman amended the application on May 6, 2014 to allege a first use date in March 2007.  This earlier first use date allowed Digital Receipts to benefit from the statutory presumption that a descriptive mark becomes distinctive after five years of use.  *See* 15 U.S.C. §  1052(f).  In light of Batterman's history of fabricating trademark claims, Batterman's convenient amendment of his claimed first use date provides yet another example of his willingness to lie whenever necessary to obtain a trademark registration.

**DIGITAL RECEIPTS' FRAUDULENT STATEMENTS REGARDING CREDITMATCH**

34.     Batterman has followed the same pattern of deceit in obtaining a registration for CREDITMATCH.  Digital Receipts submitted a trademark application for CREDITMATCH, USPTO Registration No. 4639361 (the "CREDITMATCH Registration") on June 1, 2013.

35.     In the application, Batterman declared under penalty of perjury that "the mark was first used by the applicant … or predecessor in interest as early as 10/11/2011, and is now in use in such commerce" for numerous services in Class 35.  Batterman also declared under penalty of perjury that the specimen he submitted with the application "show[ed] the mark as used in commerce."

36.     On March 13, 2014, Digital Receipts submitted an amended application. Batterman declared under penalty of perjury that "the mark was … first used in commerce at least as early as 10/11/2011, and is now in such use in commerce" for various goods and services in Classes 9, 35, and 42.  Batterman submitted a new specimen and declared "The new substitute (or new, or originally submitted, if appropriate) specimen(s) was/were in use in commerce at least as early as the filing date of the application."

37.     Batterman submitted additional specimens of use on June 13, 2014 and June 25, 2014.  Each time, Batterman declared under penalty of perjury that "The new substitute (or new, or originally submitted, if appropriate) specimen(s) was/were in use in commerce at least as early as the filing date of the application."

38.     Each of the foregoing statements by Batterman was false because Digital Receipts has never used the CREDITMATCH mark in commerce.

39.     As the CEO and the only apparent employee of Digital Receipts, Batterman knew Digital Receipts had not used the mark in commerce and that, therefore, his statements were false and made with an intent to deceive.

40.     In addition to Batterman's well-documented history of deceiving the USPTO, numerous indicia demonstrate that Batterman's statements to the USPTO concerning CREDITMATCH are false.

41.     For example, the June 1, 2014 and March 13, 2014 specimens both depict CREDITMATCH as a feature of ReceiptMatch, as shown below:

        (a)     June 1, 2014



(b)      March 13, 2014



42.    However, the webpage www.receiptmatch.com shows no content, except an error message, as follows:



43.     A review of the Internet Archive's Wayback Machine shows that Digital Receipts at one time had posted content on that website.  However, ConsumerInfo has not discovered any content displaying the CREDITMATCH mark.

44.     The June 25, 2014 specimen is an advertisement that suspiciously contains no physical address, no phone number, and no web address, which one would expect to find in an advertisement run by an actual business.



45.     Indeed, specimens that Digital Receipts submitted to obtain registrations for BILLMATCH and EXPENSEMATCH—which the USPTO has determined were obtained by fraud—contain similar or identical language to the June 25, 2014 specimen and likewise contain no physical address, web address, or phone number.



46. Moreover, Digital Receipts has submitted similar specimens for the marks RECEIPT BOT, RECEIPT FLY, RECEIPT JUMPER, RECEIPT LOCKER, REWARD MATCH, 360 MATCH, and ASK HOURS.  It is thus apparent that Batterman has created a template for generating fabricated specimens of use that he submits over and over with minor changes.  Moreover, by failing to place any information on the specimen that could be used to quickly verify whether the mark was in actual use—such as a web address—Batterman was able to avoid detection of his fraudulent scheme for many years.

47. The June 13, 2014 specimen for the CREDITMATCH mark similarly consists of a picture of a computer disk bearing the mark, but no identifying information, such as web address, physical address, or phone number:



48.     Batterman submitted a similar specimen to obtain a registration for the mark BILLHERO, which the USPTO has now determined was obtained through fraud, as well as for REBATE MATCH, DIGITAL RECEIPTS, REGISTRY MATCH, REWARDS MATCH, SALE MATCH, VOICE KODE, 360 MATCH, COUPON MATCH, DEAL MATCH, EXPENSE MATCH, GIFT MATCH, OFFER MATCH, and PROMO MATCH.

49.     On November 18, 2014, however, the USPTO relied on Batterman's false statements and issued the CREDITMATCH Registration.  Batterman's false statements were material because the USPTO would not have issued a registration but for each of Batterman's false statements.

50.     ConsumerInfo has been damaged by Batterman's false statements.  Indeed, on August 13 and August 14, 2018, the USPTO refused registration of the ConsumerInfo Applications, citing the CREDITMATCH Registration as a basis for its refusal.

51.     Moreover, citing the CREDITMATCH Registration, Batterman has threatened to sue ConsumerInfo for using the CREDITMATCH mark, imposing uncertainty as to whether ConsumerInfo can continue marketing a brand that it has already launched and in which it has already invested significant resources and forcing ConsumerInfo to incur attorney's fees to protect its investment.

## DIGITAL RECEIPTS' THREATS TO SUE CONSUMERINFO

52.     On October 26, 2018, ConsumerInfo's counsel emailed Batterman to notify him that it was aware of his history of obtaining invalid trademarks but that ConsumerInfo was willing to purchase Digital Receipts' claimed rights in CREDITMATCH for a nominal amount. The email correspondence between Batterman and ConsumerInfo's counsel is attached hereto as **Exhibit B**.

53.     After emails back and forth to arrange a time for a call, ConsumerInfo's counsel spoke with Batterman on November 1, 2018.  Counsel indicated that ConsumerInfo would be willing to purchase Digital Receipts' claimed rights for $1,000.

54.     Batterman responded that ConsumerInfo's offer did not make "business sense." ConsumerInfo would spend far more in legal fees than $1,000 litigating his claimed rights. Moreover, Batterman stated that ConsumerInfo "would not be able to use the mark for four years" while the issue was being litigated.

55.     Believing the $1,000 offer too low for an outright purchase of rights, Batterman offered to license the mark to ConsumerInfo for a yearly fee.  After ConsumerInfo's counsel stated that a license would be a non-starter, Batterman indicated that ConsumerInfo would need to offer him much more money, "something in the five-figure" range.

56.     Counsel stated that such an amount would be unwarranted, given that Batterman had not provided any evidence of actual investment or use of the mark.  Batterman responded by stating categorically that he would sue ConsumerInfo for damages and attorney's fees if it began using the CREDITMATCH mark.

57.     On November 5, 2018, counsel emailed Batterman, this time offering $2,500 to purchase Digital Receipts' claimed rights.

58.     Seven minutes later, Batterman responded by email, writing in part,

> Our insurance company has been placed on notice of your clients [sic] intent and threats and as such we are prepared to defend our valid trademark.  You clearly have not done your research regarding our mark use [sic] in interstate commerce.  As discussed on our call, if your client begins using our federally registered trademark we will seek injunctive relief as well as damages and attorney fees for your clients [sic] clear bad faith use of our mark.

## FIRST CAUSE OF ACTION

### (Declaration of Trademark Invalidity)

59.     All previous paragraphs are incorporated here.

60.     This is a declaratory judgment action under the trademark laws of the United States, 15 U.S.C.§  1051 *et seq.*, and 28 U.S.C. §§  2201 and 2202 (the Declaratory Judgment Act).  An actual justiciable controversy exists by way of credible threat of immediate litigation as a result of ConsumerInfo's use the CreditMatch and Experian CreditMatch marks.

61.     ConsumerInfo seeks a declaration that Digital Receipts' CREDITMATCH Registration is invalid because:

(a)     Digital Receipts never used the CREDITMATCH mark in commerce.

(b)     The registration was obtained by fraud for the reasons stated above.

62.     In the alternative, to the extent the mark was ever used in commerce, Digital Receipts' CREDITMATCH Registration is invalid because:

(a)     The mark has been abandoned.

(b)     Any use by Digital Receipts occurred after ConsumerInfo's use of the

mark.

(c)     Digital Receipts' use of CREDITMATCH is descriptive.

(d)     Any other reason according to proof.

63.     For the same reasons, ConsumerInfo seeks a declaration that Digital Receipts has

no enforceable rights in the CREDITMATCH mark pursuant to 15 U.S.C. §  1125.

64.     ConsumerInfo further seeks an order pursuant to 15 U.S.C. §  1119 ordering the

Director of the USPTO to cancel Digital Receipts' registration of CREDITMATCH in full or to

otherwise rectify the register to reflect the true nature of the parties' rights.

## SECOND CAUSE OF ACTION

### (Declaration of Non-Infringement)

65.     All previous paragraphs are incorporated here.

66.     This is a declaratory judgment action under the trademark laws of the United

States, 15 U.S.C.§  1051 *et seq.*, and 28 U.S.C. §§  2201 and 2202 (the Declaratory Judgment

Act).  An actual justiciable controversy exists by way of credible threat of immediate litigation as

a result of ConsumerInfo's use the CREDITMATCH mark.

67.     In the alternative, to the extent Digital Receipts has any rights in

CREDITMATCH, ConsumerInfo seeks a declaration that its use of CreditMatch and Experian

CreditMatch is not likely to cause confusion and therefore does not infringe any such rights.

68.     ConsumerInfo further seeks an order pursuant to 15 U.S.C. §  1119 ordering the

Director of the USPTO to cancel Digital Receipts' registration of CREDITMATCH in full or to

otherwise rectify the register to reflect the true nature of the parties' rights.

## PRAYER FOR RELIEF

WHEREFORE , ConsumerInfo seeks judgment as follows:

A.      An order declaring that Digital Receipts has no rights in the CREDITMATCH

mark.

B.      An order directing the Director of the USPTO to cancel Digital Receipts'

CREDITMATCH Registration.

C.      An order declaring that ConsumerInfo's use of Experian CreditMatch and

CreditMatch do not infringe any rights of Digital Receipts.

D.      An order awarding attorney's fees, costs, and expenses to ConsumerInfo.

E.      An order awarding such other and further relief as this Court deems just and

proper.


Dated: January 31, 2019                          Respectfully submitted,

                                                 *Oscar Ramallo*

                                                 Rhonda Trotter (*pro hac vice* forthcoming)
                                                 Oscar Ramallo (*pro hac vice* forthcoming)
                                                 Arnold & Porter Kaye Scholer LLP
                                                 777 South Figueroa Street, 44th Floor
                                                 Los Angeles, California  90017-5844
                                                 Telephone: +1 213.243.4000
                                                 Fax: +1 213.243.4199

                                                 Adam Tolin (Pennsylvania Bar No. 91424)
                                                 Goodell, DeVries, Leech & Dann, LLP
                                                 Two Commerce Square, 2001 Market Street,
                                                 Suite 3700
                                                 Philadelphia, PA  19103
                                                 Telephone:  +1 267.765.3607
                                                 Fax: + 1 267.765.3636

                                                 Attorneys for CONSUMERINFO.COM, INC., a
                                                 California Corporation

# EXHIBIT A

1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    INTERNMATCH, INC.,                          Case No.  14-cv-05438-JST

           Plaintiff,
8                                                **ORDER GRANTING IN PART**
                                                 **PLAINTIFF'S MOTION FOR**
9      v.                                        **TERMINATING SANCTIONS FOR**
                                                 **SPOLIATION OF EVIDENCE**
10   NXTBIGTHING, LLC, et al.,

           Defendants.                           Re: ECF No. 63
11

12          In this trademark dispute, Plaintiff InternMatch, Inc. alleges that Defendants Nxtbigthing,

13   LLC and Chad Batterman fraudulently obtained registration of the trademark "INTERNMATCH"

14   and seek cancellation of the mark.  ECF No. 1.  On November 12, 2015, InternMatch filed a

15   Motion for Terminating Sanctions for Spoliation of Evidence, ECF No. 63, which the Court now

16   considers.

17   **I.     BACKGROUND**[1]

18          **A.     Trademark Registration**

19          Founded in 2009, InternMatch provides online resources and tools to connect students

20   seeking internships with employers seeking interns.  ECF No. 1 ¶ 10.  InternMatch offers these

21   resources and tools under the name "INTERNMATCH."  Id.  The company started a trademark

22   application with the U.S. Patent and Trademark Office (USPTO) in 2009 but abandoned the

23   application by July 7, 2010.  Id. ¶¶ 18–19.  The application described the following services:

24                 Employment agency services, namely, providing a website with
                   online video, audio and textual information to support recruiting,
25                 employment branding, and general candidate evaluation; recruiting
                   services for filling corporate internship positions; providing an
26                 online searchable database featuring employment opportunities and

27   _____

28   [1] Unless stated otherwise, the following background facts are taken from the allegations of the
     Complaint.

content about employment.

Id. ¶ 20.  InternMatch filed a new trademark application in January of 2014, but the application

was suspended because of an application for the same mark filed by defendant Nxtbigthing.  Id. ¶¶

21, 27.

On March 27, 2013, Nxtbigthing is a limited liability company owned by Chad Batterman.  ECF No. 32 ¶ 2.

Chad Batterman first began using the mark INTERNMATCH as a trademark for his job searching

services in 2007.  Id. ¶ 8.  In 2012, Batterman formed Nxtbigthing, LLC to operate the business.

On March 27, 2013, Nxtbigthing filed an intent-to-use trademark application for

INTERNMATCH, and the application issued on November 18, 2014.  ECF No. 1 ¶ 22; ECF No.

32 ¶ 22.  The application described the following services:

> Online computer services, namely, providing a website that offers
> the exchange of information in the field of employment
> opportunities and career placement, recruitment, careers, and job
> listings, providing an on-line searchable database featuring
> classified ad listings and employment opportunities, career
> networking services, providing a web site featuring the ratings,
> reviews and recommendations on employers and employees and
> places of employment for use by employees, employers, business
> owners, and consumers.

ECF No. 1 ¶ 22.  In its statement of use, Nxtbigthing states that the trademark was first used in

commerce on February 15, 2007.  ECF No. 1 ¶ 23.

On January 15, 2014, InternMatch sent Batterman a letter, informing him of InternMatch's

"prior rights in the INTERNMATCH trademark."  Id. ¶ 28.  Batterman responded by offering to

settle the INTERNMATCH matter for $325,000.  Id. ¶ 29.  Batterman also provided documents to

InternMatch, demonstrating use of the INTERNMATCH trademark as early as 2007.  Id.  The

documents included marketing flyers and an activity log.  Id. ¶ 30; see id. ¶¶ 31–34 (providing

copies of the documents sent to InternMatch).  InternMatch did not accept Batterman's offer to

sell his rights in the trademark.  InternMatch alleges that Defendants subsequently issued

trademark claim notices to various social networking services used by InternMatch.  Id. ¶ 45.

**B.      Underlying Litigation**

InternMatch filed its complaint on December 12, 2014.  See ECF No. 1.  In it, InternMatch

alleges five causes of action: (1) false designation of origin; (2) cancellation for fraud on the

1   USPTO; (3) cancellation for lack of use in commerce; (4) declaratory judgment that InternMatch

2   has superior rights to Nxtbigthing and Chad Batterman in the INTERNMATCH trademark; and

3   (5) unfair competition under California's Business and Professions Code section 17200.  Id.

4   InternMatch alleges that "Nxtbigthing and Mr. Batterman currently hold or control various

5   trademark registrations and/or trademark applications that have been or are being prosecuted

6   through the use of false specimens of use at the USPTO."  Id. ¶ 39.  InternMatch argues that

7   central to these claims is a determination of whether InternMatch or Nxtbigthing has priority in the

8   INTERNMATCH trademark and whether Batterman created and provided genuine evidence of

9   use documents.  ECF No. 63 at 11.

10       Defendants Nxtbigthing and Chad Batterman answered the Complaint on February 25,

11   2015.  See ECF Nos. 31, 32.  Nxtbigthing also filed counterclaims alleging (1) trademark

12   infringement, (2) unfair competition under the Lanham Act; and (3) unfair competition under

13   California's Business and Professions Code section 17200.[2]  See ECF No. 32.  Defendants'

14   Answer states that "[f]rom 2007 through current day, Mr. Batterman and Nxtbigthing have

15   continuously and extensively used the mark INTERNMATCH® in interstate commerce."  ECF

16   No. 32 ¶ 14.

17       On May 6, 2015, the parties submitted a joint case management statement and identified

18   the principal factual issues in dispute:

> Whether the evidence of commercial use of the INTERNMATCH
> trademark by Defendants are genuine and whether statements made
> by Defendants in order to procure its INTERNMATCH trademark
> registration are fraudulent, such that Defendants do not own any
> rights to the trademark INTERNMATCH. Additionally, the parties
> dispute whether Plaintiff is an infringer of the INTERNMATCH
> trademark.

23   ECF No. 49 at 3.  The parties' joint case management statement also stated that the parties' had

24   taken reasonable steps "to preserve evidence relevant to the issues reasonably evidence in this

25   action."  Id. at 4.

---

[2] On December 25, 2015, Nxtbigthing filed a motion to voluntarily dismiss its counterclaims.
ECF No. 83.  The Court addresses that motion in a separate order.

1

### C.   Loss of Evidence

In discovery, InternMatch sought copies, including electronic copies, of documents that would support Nxtbigthing and Batterman's assertions that they have used the InternMatch mark "continuously and extensively."[3]  In response to InternMatch's requests for production, Nxtbigthing informed InternMatch that electronic copies of potentially responsive documents "were irretrievably lost in August 2011 due to a lightning strike, and in April 2015 due to a power surge."  See ECF No. 65-1, Keyes Decl., Ex. 7.

InternMatch asked Batterman about these assertions at his deposition.  He testified that Nxtbigthing created a database in 2007 or 2008 that permitted users to search for job postings. ECF No. 64-1, Keyes Decl., Ex. 1, Batterman Tr. 62:12–23.  The database was maintained on hard drives.  See id. at 62:24–64:10.  Two separate lightning strikes hit Batterman's office in August and September or October of 2011.  Id. at 75:1–14.  Batterman testified that, as a result of the August 2011 lightning strike, the data on the hard drives were not recoverable.  Id.  Batterman purchased a replacement iMac desktop computer in August or September of 2011.  Id. at 96:14–22.  Batterman transferred documents evidencing his use of the INTERNMATCH mark to the desktop computer through a backup jump drive on which Batterman had stored past marketing and advertising materials and financial information.  Id. at 130:16–132:7.  Batterman testified that he was able to reconstruct a new database because many of the job postings existed in paper form. Id. at 77:17–78:3.

Defendants allege that a power surge destroyed the iMac desktop computer and other electronic devices on April 2, 2015, while this litigation was pending.[4]  Sometime between April 5, 2015 and April 12, 2015, various electronic devices, including the iMac desktop computer that contained corporate records and marketing material central to the parties' dispute, were discarded. Defendants did not run diagnostics on the iMac desktop computer to see if the files on the hard

---

[3] The parties have submitted the discovery responses, but not the original requests.

[4] Correspondence between Batterman and his insurer notes that Batterman initially reported that the power surge occurred on April 2, 2015.  See ECF No. 65-5, Keyes Decl., Ex. 11.

United States District Court
Northern District of California

1  drive could be recovered prior to discarding it.  ECF No. 64-1, Keyes Decl., Ex. 1, Batterman Tr.

2  19:9–18, 20:5–25.  The desktop computer contained the only electric copies of Nxbigthing's

3  marketing materials that allegedly established prior use.  ECF No. 63 at 15.

4  On November 12, 2015, InternMatch filed the present motion for terminating sanctions,

5  accusing Defendants of intentionally destroying the electronic versions of the evidence of use

6  documents.  ECF No. 63.  Nxtbigthing and Chad Batterman filed a response on December 1,

7  2015.[5]  ECF No. 72.  InternMatch filed a reply on December 4, 2015.  ECF No. 77.  The Court

8  heard argument on December 17, 2015.  ECF No. 82.

9  **II.      JURISDICTION**

10  The Court has jurisdiction under 28 U.S.C. § 1338 and 28 U.S.C. § 1331.

11  **III.     LEGAL STANDARD**

12  Spoliation is the destruction or significant alteration of evidence, or the failure to preserve

13  property for another's use as evidence in pending or reasonably foreseeable litigation.  United

14  States v. Kitsap Physicians Svs., 314 F.3d 995, 1001 (9th Cir. 2002).  A party must "suspend any

15  existing policies related to deleting or destroying files and preserve all relevant documents related

16  to the litigation."  In re Napster, Inc. Copyright Litig., 462 F. Supp. 2d 1060, 1070 (N.D. Cal.

17  2006) (citation omitted).

18  The court's authority to sanction a party for despoiling evidence derives from two sources:

19  "the inherent power of federal courts to levy sanctions in response to abusive litigation practices,

20  and the availability of sanctions under Rule 37 against a party who 'fails to obey an order to

21  provide or permit discovery.'"  Leon v. IDX Sys. Corp., 464 F.3d 951, 958 (9th Cir. 2006)

22  (quoting Fed. R. Civ. P. 37(b)(2)).  The court may make factual findings in relation to a motion for

23  sanctions based on the spoliation of evidence.  Id.  "A court may sanction spoliation by: imposing

24  monetary sanctions; instructing the jury to draw an adverse inference against the despoiling party;

25  excluding testimony based on despoiled evidence proffered by the despoiling party; or, if

26  willfulness is found, entering default judgment against the despoiling party."  Columbia Pictures,

27

28  _____
[5] Defendants' response was untimely.

5

1    Inc. v. Bunnell, No. 2:06CV01093 FMC–JCX, 2007 WL 4877701, at *4 (C.D. Cal. Dec. 13,

2    2007).

3         Rule 37 of the Federal Rules of Civil Procedure was recently amended, and now provides

4    as follows:

5         (e) Failure to Preserve Electronically Stored Information.  If
     electronically stored information that should have been preserved in
6    the anticipation or conduct of litigation is lost because a party failed
     to take reasonable steps to preserve it, and it cannot be restored or
7    replaced through additional discovery, the court:

8         (1) upon finding prejudice to another party from loss of the
     information, may order measures no greater than necessary to
9    cure the prejudice; or

10        (2) only upon finding that the party acted with the intent to
     deprive another party of the information's use in the litigation
11   may:

12        (A) presume that the lost information was unfavorable to the
     party;

13

14        (B) instruct the jury that it may or must presume the
     information was unfavorable to the party; or

15        (C) dismiss the action or enter a default judgment.

16   FED. R. CIV. P. 37(e).  Any remedy applied to a spoliator "should be designed to: (1) deter parties

17   from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who

18   wrongfully created the risk; and (3) restore 'the prejudiced party to the same position he would

19   have been absent the wrongful destruction of evidence by the opposing party.'"  Apple Inc. v.

20   Samsung Elecs. Co., 881 F. Supp. 2d 1132, 1136 (N.D. Cal. 2012) (internal quotation omitted).

21        "A terminating sanction, whether default judgment against a defendant or dismissal of a

22   plaintiff's action, is very severe."  Connecticut General Life Ins. Co. v. New Images of Beverly

23   Hills, 482 F.3d 1091, 1096 (9th Cir. 2007).  Entry of a default judgment is permitted when the

24   disobedient party has "willfully deceived the court and engaged in conduct utterly inconsistent

25   with the orderly administration of justice." Wyle v. R.J. Reynolds Indus., Inc., 709 F.2d 585, 589

26   (9th Cir. 1983).  A terminating sanction, however, may only issue if the violation or abuse is

27   willful, in bad faith, or the fault of the party.  Id.  "Disobedient conduct not shown to be outside

28   the control of the litigant is sufficient to demonstrate willfulness, bad faith, or fault."  Jorgensen v.

United States District Court
Northern District of California

6

1    Cassiday, 320 F.3d 906, 912 (9th Cir. 2003) (quoting Hyde & Drath v. Baker, 24 F.3d 1162, 1166

2    (9th Cir. 1994)).

3            The Ninth Circuit identifies five factors a court must weigh in determining whether the

4    terminating sanction is justified:

5                    (1) the public's interest in expeditious resolution of litigation; (2)
                     the court's need to manage its dockets; (3) the risk of prejudice to
6                    the party seeking sanctions; (4) the public policy favoring
                     disposition of cases on their merits; and (5) the availability of less
7                    drastic sanctions.

8    Leon, 464 F.3d at 958.  Finally, "due process concerns further require that there exist a

9    relationship between the sanctioned party's misconduct and the matters in controversy such that

10   the transgression 'threaten[s] to interfere with the rightful decision of the case.'"  Anheuser-Busch,

11   Inc. v. Nat. Beverage Distributors, 69 F.3d 337, 348 (9th Cir. 1995) (quoting Wyle v. R.J.

12   Reynolds Indus., Inc., 709 F.2d 585, 591 (9th Cir. 1983)).[6]

13   **IV.    DISCUSSION**

14           As part of the Court's inherent power, InternMatch requests that the Court grant default

15   judgment against Defendants on all of InternMatch's claims and dismiss with prejudice

16   Nxtbigthing's counterclaims.  Alternatively, InternMatch requests that the Court (1) give an

17   adverse inference jury instruction, informing the jury that Defendants destroyed evidence that

18   would have supported InternMatch's claims, and (2) preclude Defendants from offering testimony

19   or argument that the spoliated evidence supports (or would have supported) Defendants'

20   allegations that they have priority to the trademark.  InternMatch also requests that the Court

21   impose monetary sanctions against Defendants.  See ECF No. 63.

22

23   _____

24   [6] Different courts have applied different tests in determining the appropriate sanction for the
     spoliation of electronic evidence.  The recent amendments to Rule 37 were "designed to provide a
     uniform standard in federal court for use of these serious measures when addressing failure to
25   preserve electronically stored information."  Advisory Committee Notes, FED. R. CIV. P. 37.
     Whether a district court must now make the findings set forth in Rule 37 before exercising its
26   inherent authority to impose sanctions for the spoliation of electronic evidence has not been
     decided.  Here, the Court determines both that the Defendants' conduct was willful and in bad
27   faith, and that defendants "acted with the intent to deprive another party of the information's use
     in the litigation."  FED. R. CIV. P. 37(e)(2).  Accordingly, it need not resolve the question of the
28   relationship of the recent amendments to the existing case law.

                                                    7

**A.      Duty to Preserve Relevant Evidence**

Defendants were under a duty to preserve documents that showed their prior use of the disputed mark.  "As soon as a potential claim is identified, a litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action."  In re Napster, 462 F. Supp. 2d at 1067.  Shortly after litigation commenced, "previous lead counsel"[7] instructed Batterman to print out a sample of relevant records, including Nxtbigthing's marketing fliers, and screenshots of the properties of some of the files, showing the file's size, local path location, creation date, and last-modified date.  Batterman Decl. ¶ 5.  Batterman states that about 100 pages were printed out.  ECF No. 64-1, Keyes Decl., Ex. 1, Batterman Tr. 19:24–20:4.  These documents purportedly showed Nxtbigthings evidence of prior use of the disputed mark.

The documents on the discarded iMac desktop computer assertedly included electronic versions of Defendants' evidence of use documents.  These documents were unarguably relevant to Defendants' claims in the litigation, as well as to InternMatch's assertion that "Defendants fabricated documents to show their 'use' of the InternMatch mark."  ECF No. 63 at 8.

InternMatch argues that Defendants were clearly on notice of their duty to preserve evidence no later than the date that both Defendants were served with the Complaint in January 2015.  ECF No. 63 at 21.  That duty extended to historical and electronic versions of the documents showing Defendants' prior use of the mark, because the Complaint alleges that those documents are not genuine.  ECF No. 1 ¶¶ 30, 32–35.  The Court finds that at least by January 2015, Defendants knew about the present action and were under a duty to preserve relevant evidence.

The evidence shows that Defendants violated this duty.  Batterman testified that the only electronic versions of the evidence of use documents were on the iMac desktop which was discarded months after litigation began.  ECF No. 64-1, Keyes Decl., Ex. 1, Batterman Tr. 19:19–

[7] Defendants were previously represented by Andrew Serros at Schinner and Shain, LLP and Jill Browning and Jeffrey Handelsman of Greenblum & Bernstein, P.L.C.  See ECF No. 37.  On March 6, 2015, Browning and Handelsman moved to withdraw as counsel of record.  Id.  On March 19, 2015, notice of substitution of counsel was provided noting that Quinn Chevalier of Schinner & Shain, LLP would be the substituted counsel of record for Defendants.  ECF No. 41.

United States District Court
Northern District of California

20:4.  At his deposition, Batterman testified that he could not recall whether he or his wife, Silvia Santo, discarded that particular computer, id. at 19:3–10, but he later submitted a declaration averring that his wife discarded it.  ECF No. 73, Batterman Decl. ¶ 24 ("The devices that my wife disposed of contained all of NXT's electronically stored information and data, including all electronic copies of NXT's marketing materials that are the subject of this litigation.").  Santo also declared that she discarded the iMac desktop.  ECF No. 74, Santo Decl. ¶ 7.

Prior to discarding the desktop, Batterman did not make any effort to determine whether the hard drive on the desktop was salvageable or any data could be recovered from it.  ECF No. 64-1, Keyes Decl., Ex. 1, Batterman Tr. 20:5–25.  As a result, the parties can only access the few existing paper copies of the relevant documents, rather than the electronic files, which would include valuable information such as the creation and modification history of the files.

Because the duty to preserve relevant evidence attached by January 2015, and Defendants violated that duty, the Court must determine whether to impose sanctions, and if so, in what form.  As discussed below, the appropriate sanction depends on the culpability of the Defendants and the resulting prejudice to InternMatch.  In re Napster, 462 F. Supp. 2d at 1070.

### B.      Spoliation of Evidence

InternMatch argues Defendants intentionally discarded devices that contained the electronic versions of the evidence of use documents and that the April 2015 power surge alleged by Defendants is implausible.  See ECF No. 63 at 8.  To support its contentions, InternMatch compares Batterman's deposition testimony with statements made to his insurer and materials he submitted to his insurer for his claim.

#### 1.      Denial of Further Coverage on Batterman's Insurance Claim

After the alleged power surge, Batterman submitted claims to his homeowner's insurance carrier, Homesite Home Insurance, and to his business insurance carrier, The Hartford.  ECF No. 73, Batterman Decl. ¶ 18.  Batterman states that "[b]oth investigations concluded that the power surge happened, and both insurance carriers paid out on the claims."  Id. ¶ 20.  Homesite did pay out nearly $19,000, but part of Batterman's claim "was denied because they said that some of the affected equipment was used for business purposes, and thus not covered by [his] homeowner's

9

1   policy." <u>Id.</u> ¶ 15.  Batterman asserts that his insurance carrier has never accused him of

2   committing fraud.  <u>Id.</u> ¶ 16.

3          Records subpoenaed from Batterman's homeowner's insurance carrier, however, do not

4   support his contentions.  While the insurance carrier paid out roughly $18,000 in two installments,

5   the carrier denied further coverage of the claim.[8]   In fact, after conducting an investigation of

6   Batterman's claims, Homesite denied coverage, citing "concealment or fraud" as the reason for the

7   exclusion.  <u>See</u> ECF No. 65-5, Ex. 11; ECF No. 65-6, Ex. 12.

8          In a letter dated June 26, 2015, Homesite noted a number of inconsistencies with

9   statements made throughout the claims process "which supports that misrepresentation of material

10  facts of the loss has occurred."  ECF No. 65-5, Ex. 11.  The insurer noted the following issues:

11   •   On March 25, 2015, Batterman called to ask about coverage for damages due to a
12       power surge but stated there were no damages at the time.  On April 4, 2015,
         Batterman filed a claim for a power surge that occurred on April 2, 2015.
13
14   •   Batterman initially claimed he heard a loud noise due to a power surge that blew
         the breaker and damaged the devices.  In a subsequent statement made to a field
15       investigator, Batterman stated that he was out running errands and not at home
         when the surge occurred.
16
17   •   Homesite instructed Batterman that he would need to run a diagnostic report on the
         items but he stated that he could not wait that long.  In a subsequent statement to
18       the field investigator, Batterman stated that an electrician ran diagnostics on all of
         the damaged items.  Batterman stated he could not take the computers to have
19       diagnostics performed because he did not own a vehicle.  However, Santo revealed
         to the field investigator that Batterman used a vehicle to dispose of the electronics.
20
21   •   On April 10, 2015, Batterman informed the insurer that he still had items that were
         damaged.  The insurer instructed Batterman on the salvage process, but Batterman
22       expressed concern about sensitive data that would be turned over to the insurer.  On
         April 14, 2015, the salvage adjuster called regarding the items but Batterman
23       informed the adjuster that all items were thrown out and that the insurer did not
         inform him about the salvage process.
24
     <u>Id.</u>
25
26          The insurer followed up on July 24, 2015, to respond to Batterman's inquiries regarding

27   _____

28   [8] InternMatch points out that the insurer's denial letters came only weeks before Batterman's
     deposition.  Yet at his deposition, Batterman insisted that his claims were properly paid out.  <u>See,</u>
     <u>e.g.</u>, ECF No. 64-4, Ex. 4, Batterman Tr. 231:21–242:3.

United States District Court
Northern District of California

the denial letter.  The insurer reiterated the inconsistencies cited above, and also raised additional

concerns:

- The insurer suggested that Batterman take the items to Best Buy for diagnostics and he insisted that he would not do that because of proprietary information on his computers and because he lacked a vehicle.  However, in Batterman's July 15, 2015 email, he denies saying that he wouldn't take the items to Best Buy and that Best Buy does not offer diagnostics testing.

- Batterman's email noted that the electrician made two visits: one to inspect the outlets and another to inspect the computer equipment and run diagnostics.  The insurer only received "a generic invoice dated 4/7/15" regarding the first visit.  The insurer never received the diagnostics report or invoice from the second visit.  In a subsequent conversation with the field investigator, the electrician stated he changed four outlets and looked at a computer and printer.

- The insurer instructed Batterman to obtain diagnostics on all damaged items; however, Batterman did not comply and discarded the computers.  The insurer noted their initial payment "was made in good faith" without Batterman having completed the requested diagnostics.

- The receipts for electronics submitted by Batterman show redactions or alterations.  One invoice shipped items to a business called Diamond Ridge Camps.  Batterman stated he had never worked there, but the insurer's investigations identified that he had previously been an employee there.

- Both the power company and the property manager had zero reports of surge-related activity.

ECF No. 65-6, Ex. 12.  This letter again identified "concealment or fraud" as the policy exclusion.

Id.

On August 7, 2015, the insurer again confirmed that it would deny the remaining portions

of the claim.  ECF No. 66-1, Ex. 13.

Internal records from the insurer also show that upon subsequent investigation into

Batterman's claim, the insurer declined paying further on the claim due to misrepresentation.  ECF

No. 66-2, Ex. 14.  The records also detail Batterman's correspondence with the insurer, in which

stated that he did not agree to release of the details of the claim if the insurer was subpoenaed.[9]

---

[9] Defendants point out that that Batterman's business insurance policy has released $5,000 to assist in the replacement of the items in the power surge.  ECF No. 72 at 8; ECF No. 73-1, Batterman Decl., Ex. A.  Beyond a confirmatory email from the insurance company, Batterman has not submitted additional information regarding that claim.

11

1    See id.

2              2.        **Implausibility of the Power Surge**

3              On March 25, 2015, Batterman called Homesite Home Insurance, his insurance carrier, to

4    inquire about how a power surge claim would be handled.[10]  See ECF No. 65-5, Ex. 11; ECF No.

5    65-6, Ex. 12.  Batterman had no damage to report at that time.  Id.  Ten days later, on April 4,

6    2015, Batterman filed a claim, alleging that on April 2, 2015 – a mere eight days after his call

7    asking about power surge claims – his apartment experienced a power surge that irreparably

8    damaged several electronic devices in his home office.  See id.  Batterman claims that all

9    electronic devices plugged into affected outlets were "fried," including: "two iMac desktops, at

10   least one MacBook laptop, a printer, a Pogo plug, and two or three external hard drives."  ECF No.

11   73, Batterman Decl. ¶ 10.  InternMatch contends that this chronology of events demonstrates that

12   Defendants fabricated the power surge story.  ECF No. 63 at 17.

13             According to Defendants, the power surge affected four to six electrical outlets and the

14   electronic devices in one part of the home office of their apartment, but the rest of the apartment

15   had electricity.  See, e.g., ECF No. 64-6, Keyes Decl., Ex. 6, Santo Tr. 89:13–17.  Batterman

16   never notified the landlord or property manager of the surge.  Id., Ex. 3, Batterman Tr. 179:15–18;

17   Ex. 4, Batterman Tr. 284:22–23.  A separate insurance coverage letter from Homesite Home

18   Insurance, detailing why the additional coverage was denied, noted that its field investigator

19   concluded that no reports of any surge related activity were made to the power company and the

20   property manager during the time of the alleged power surge.  ECF No. 65-12, Keyes Decl., Ex.

21   12.  InternMatch's electrical engineering expert, Joseph Greco, also reports that there was no

22   evidence of lightning occurring in the area during the time period of the alleged power surge.  ECF

23   No. 70-1, Ex. 1 at 7.  The expert also concluded that a scenario where only four or five electrical

24   outlets were affected is "highly unlikely."  Id. at 6.

25

26   [10] Batterman states he was motivated to inquire about his policy because "stormy weather" in
     March 2015 reminded him of a prior lightning strike and the effect it had on his equipment.  ECF
27   No. 63 ¶ 8.  This prompted him to call this carrier to find out the scope of coverage for lightning
     strikes and power surges.  Id.  Batterman testified that in 2011, lightning actually struck the same
28   place twice – in August of 2011, destroying all hard drives, and September or October of 2011,
     destroying his firewall.  ECF No. 64-1, Ex. 1, Batterman Tr. 75:1–9.

United States District Court
Northern District of California

Defendants offer an expert rebuttal from Dr. John Tobias.  See ECF No. 75, Exs. A-C.

Tobias states that many transient power outages are caused by internal sources within a facility.

See id., Ex. B at 4.   Tobias also opines that "situations" within a residence can cause a transient

power outage to only one branch circuit, and that Greco's report did not rule out that possibility as

a cause of the damage in this case.  Id. at 5.  Finally, Tobias places emphasis on the testimony of

the electrician, Stephen Crooks, who came to inspect and replace the electrical outlets after the

alleged power surge.  Tobias notes that "Mr. Crooks' opinion that the receptacles and equipment

listed in his statement were damaged by 'surge' or overcurrent needs consideration, as the only

third party and person with electrical training that is known to have observed the physical

evidence consisting of the damaged equipment."  Id. at 6.

The Court need not weigh the competing opinions of the parties' experts.  Batterman's

story about the power outage simply is not plausible.  His phone call to his insurance carrier a

mere eight days before the alleged power surge was not a coincidence.  The inconsistencies within

his insurance claims, and between his deposition testimony and his filed claims, strengthen the

conclusion that Batterman fabricated his account regarding the power surge.

### 3.    Batterman's Representations about the Electrician

As part of the materials submitted to verify his insurance claim, Batterman included an

invoice from an electrician named Steve Crooks.[11]  ECF No. 66-3, Ex. 15.  The invoice

generically states that it is an "Electrical Work Order" and does not identify the company

providing the services.  See id.  The invoice charges $300 for an outlet voltage test and

replacement of four outlets.[12]  Id.  When asked at his deposition about the name of the electrician,

Batterman repeatedly testified that he could not recall the name of his electrician:

> Q. Okay. And I believe you testified that you, you weren't the one

---

[11] InternMatch notes that this invoice was not produced by Defendants, but rather obtained as a result of InternMatch's subpoena to the insurance carrier.  InternMatch received this information after depositions of both Batterman and Crooks concluded.  See ECF No. 77 at 4 n.5.

[12] Batterman also reported to his insurer that an electrician performed work twice: the first time, to replace the outlets and conduct a volt test and the second time, to run diagnostics on his electronic devices.  Batterman did not produce any evidence to substantiate the second visit.  See ECF No. 65-5, Ex. 11; ECF No. 65-6, Ex. 12.

13

United States District Court
Northern District of California

1   responsible for contacting the electrician to have the outlets changed, right?

2   A. No, I didn't say that. I said I didn't recall the name of the electrician that came out.

3   Q. You what?

4   A. I said I didn't recall the name of the electrician that came out to change the outlets.

5   Q. Okay. So sorry if I misunderstood that, so did you, did you personally place a call to the electrician to have the electrician come and –

6   

7   A. I did. I did.

8   …

    Q. Hold on. Do you have any records of who the electrician was that came to the the, that came to the apartment to switch out the outlets?

9   

10  A. I will check.

    ECF No. 64-3, Ex. 3, Batterman Tr. 177:17–178:18.

11  

12  Q. Okay. How did you get the name of the electrician, if you recall?

    A. Doing previous work at my, doing work at my previous job.

13  Q. You recall -- I don't get it, you recalled the name of this individual from your previous job?

14  

15  A. I looked it up.

    Q. Where did you look it up?

16  A. I believe notes from my old position.

17  Q. Notes from your old position?

    A. Contact information, yes.

18  Q. Notes from your old position U.S. Rec?

19  A. Yes.

    Q. Okay. And do you still have those notes?

20  

21  A. No, I looked him up and I found what I needed and I discarded them.

22  …

    Q. So you've used this electrician on at least two occasions then?

23  A. Yes.

24  Q. And you don't remember the name of the company?

25  A. I do not. Not offhand.

    Q. And you don't remember the name of the individual?

26  A. No. I'll have to check my records.

27  Id. at 180:3–22; 182:10–17.

28      On a separate day of his deposition, Batterman again affirmed that he could not recall the

United States District Court
Northern District of California

name of the electrician, Steve Crooks:

> Q. How did you find his number?
>
> A. I told you on Tuesday. I went to my previous job and I found his number there, and then I contacted him. And he made arrangements to come and swap the receptacles out and test for the electrical disturbance.
>
> Q. And you -- you don't -- I can't remember, do you remember his first name and you don't remember his last name?
>
> A. Not off the top of my head, I don't.
>
> Q. You don't remember either the first or last name?
>
> A. I don't remember who the electrician was right now.
>
> Q. Okay. And you don't remember what company he was with?
>
> A. I don't. I don't think -- I don't know if he was with a company or by himself.

ECF No. 64-4, Ex. 4, Batterman Tr. 298:17–299:12.

When the insurance carrier's field investigator contacted Crooks, as part of its investigation into the claim, Crooks stated that a friend had referred him, but when asked the friend's name, he said that he did not know.  ECF No. 66-2, Ex. 14.

Batterman's repeated, emphatic lack of recollection as to Crooks' identity, as the electrician who made these repairs, strains belief.  At Crooks' deposition, Crooks testified that he has known Batterman for several years and has assisted Batterman with passing out flyers on 18 to 24 separate occasions.  ECF No. 64-5. Ex. 5, Crooks Tr. 20:12–23, 35:10–23.  As part of their Rule 26(a)(1) initial disclosures, Defendants identified Stephen Crooks, an electrical engineer with SEPTA, as a person "likely to have knowledge of issues related to the use of the trademark InternMatch since 2007."  ECF No. 65-2, Ex. 8.  Defendants stated that Crooks used the job service "for years" and also distributed marketing materials for Nxtbigthing "for years."  Id. Batterman explicitly discussed Crooks as an individual who helped promote the trademark.  See ECF No. 64-1, Ex. 1, Batterman Tr. 54:5–21, 56:21–24, 153:7–17, 154:9–14.

The Court can only conclude that either Batterman lied under oath when he stated he could not recall the name of his electrician or lied when submitting the invoice for electrical repairs to his insurer.  In either event, Batterman's duplicitous statements regarding Crooks further support the conclusion that Batterman's power surge story is a fabrication.

15

### 4.    Discarded Devices

Batterman and Santo testified that after the power surge, they tried to turn on the affected devices, but none would power up.  ECF No. 73, Batterman Decl. ¶ 21; ECF No. 74, Santo Decl. ¶ 4.  After this discovery, however, Batterman never took the devices to a technician to run diagnostics on the affected devices in order to determine whether the devices or data on the devices could be salvaged.  At his deposition, Batterman confirmed that he did not try to salvage the iMac desktop:

> Q. So you discarded the October 2011 desktop?
>
> A. Along with some other electronics, yes.
>
> Q. We'll get to those. But who was the one that actually discarded the October 2011 desktop Mac. Was that you?
>
> A. I don't recall. It was myself or my wife, because I believe she discarded a few items and I discarded a few items.
>
> Q. What did you do, just throw it in the garbage?
>
> A. Yeah.
>
> Q. Did you try to salvage it or safe the hard drive?
>
> A. No, mostly because the smell. It was smell like a burnt after keeping it in our apartment for a few days, it just permeated the apartment and it was unbearable so that's why -- that's the main -- really the main reason why it was discarded. Other than that, we would have kept it.
>
> Q. So the October 2011 desktop Mac, it had corporate records on it, right?
>
> A. Um, I believe so. Yeah, I believe so.
>
> Q. You would have had copies of NextBigThing marketing and advertising collateral?
>
> A. Correct. But I also printed everything out in preparation of Greenblum & Bernstein advised me to do.

ECF No. 64-1, Keyes Decl., Ex. 1 Batterman Tr. 19:1–25.  Although his home insurance company suggested that he take the computers to Best Buy to run diagnostics, Batterman stated that Best Buy informed him they could not offer technical services in connection with insurance claims. Batterman Decl. ¶ 21.  Batterman did not seek out other services.

Batterman and Santo noted that the affected devices emitted a "strong, foul odor of burnt plastic and electronics."  ECF No. 72 at 9; Batterman Decl. ¶ 23; Santo Decl. ¶ 6.  Defendants argue that because the odor caused nausea, Santo discarded the affected electronic devices,

16

1    including the iMac desktop and two or three external hard drives.  ECF No. 72 at 10.  These

2    specific devices "contained all of [Nxtbigthing]'s electronically stored information and data,

3    including all electronic copies of [Nxtbigthing]'s marketing materials that are the subject of this

4    litigation."  Id.; Batterman Decl. ¶ 24.  Coincidentally, Santos discarded all of the devices used by

5    Nxtbigthing and Batterman discarded all of the devices used personally.  See id.; Batterman Decl.

6    ¶ 27.

7           In opposing the present motion, Defendants primarily argue that although the electronic

8    devices were discarded after litigation began, they were not discarded *by Defendants*, and so

9    Defendants bear no responsibility for the loss of evidence.  According to them, all of the relevant

10   electronic devices were discarded by Santo, "and she did so of her own accord without notifying

11   Defendants in advance."  ECF No. 72 at 12.  Defendants stress that Santo, with heightened

12   olfactory sensitivities from her pregnancy, had no option *but* to discard the devices.  Batterman

13   and Santo had no alternative storage space and Santo was unaware of the "need to safeguard any

14   potentially relevant evidence for this litigation."  Id. at 10.

15          The Court does not find it credible that *even if* the power surge occurred and *even if* the

16   power surge damaged the electronic devices, Santo discarded only the electronic devices used by

17   Nxtbigthing, and Batterman discarded only his personal electronic devices purely by happenstance

18   – or that such a division of effort occurred at all.

19          Finally, even if the Court accepted this strained version of events in its entirety (and it does

20   not), Nxtbigthing would still be culpable for spoliation, because Defendants would still have failed

21   in their obligation to ensure that relevant evidence be preserved.  For example, Santo was

22   apparently never informed about the parameters of the lawsuit against Batterman and Nxtbigthing,

23   or her duty to preserve evidence, see ECF No. 73, Batterman Decl. ¶ 25; ECF No. 74, Santo Decl.

24   9, even though she is a contributor to Nxtbigthing and was identified in Defendants' initial

25   disclosures as an individual with discoverable information:

26              This person is likely to have knowledge of issues related to the use
               of Defendants' trademark InternMatch since 2007. Ms. Santo has
27              used Defendants' service over the years to search for job
               availability, and has traveled the country assisting in the marketing
28              of Defendants' business. Ms. Santo has assisted in the graphic

United States District Court
Northern District of California

1    designs of marketing materials. Ms. Santo's relationship began in
     Pennsylvania.

2    ECF No. 65-2, Ex. 8. In light of Santo's role at Nxtbigthing, Defendants failed to meet their

3    discovery obligations by failing to communicate their discovery obligations to her. See Nat'l

4    Ass'n of Radiation Survivors v. Turnage, 115 F.R.D. 543, 557–58 (N.D. Cal. 1987) ("The

5    obligation to retain discoverable materials is an affirmative one; it requires that the agency or

6    corporate officers having notice of discovery obligations communicate those obligations to

7    employees in possession of discoverable materials."). Defendants also failed to take any steps to

8    safeguard relevant evidence once the alleged power surge occurred, having never verified whether

9    data from the affected devices could be retrieved and preserved. InternMatch's expert, Christian

10   Hicks, stated that even if a computer had been damaged by a power surge, it is possible for a

11   technician "to remove the storage medium and connect it to a working computer." ECF No. 67-5,

12   Ex. 23. If the data is intact, a technician could then copy the data onto a new storage device. Id.

13   Batterman did not explore this process.

14        The Court finds that at the very least, Defendants consciously disregarded their obligations

15   to preserve relevant evidence. There is no evidence that Defendants took any steps to preserve

16   relevant information after the litigation began. They did not communicate their evidence

17   preservation obligations to Santo, even though she performed marketing and does graphic design

18   tasks for Nxtbigthing and has access to Nxtbigthing's electronic devices. After the alleged power

19   surge, Defendants failed to identify whether data from the electronic devices might be recoverable,

20   and instead simply discarded the devices.

21        The Court also finds Defendants' evidence that the surge occurred in the first place to be

22   unbelievable. Not only is the alleged chronology of events highly improbable, but Defendants'

23   story is filled with inconsistencies. The Court does not know what actually happened to the

24   missing evidence, if it ever existed, but concludes that Defendants have failed to show that it was

25   lost in a power surge.

26        In light of the foregoing, the Court concludes that Defendants willfully spoliated evidence.

27   The Court further finds that the extraordinary measures Batterman undertook to mislead opposing

28   counsel and the Court merit a finding of bad faith.

United States District Court
Northern District of California

18

**C.     Warranted Sanctions**

**1.     Default Judgment**

Once a court finds that evidence has been destroyed, it must determine whether sanctions are appropriate.  InternMatch seeks a terminating sanction, i.e., the entry of default judgment, against Defendants or, in the alternative, an adverse inference jury instruction and the exclusion of certain evidence.

Courts in this circuit apply a five-factor test to determine whether a terminating sanction is warranted.  See Leon, 464 F.3d at 958 (identifying (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions).  The court need not make explicit findings regarding each of these factors, but must make a finding of "willfulness, fault, or bad faith" for dismissal to be proper. Id.

The first two factors weigh in favor of a default judgment.  Computer Task Grp., Inc. v. Brotby, 364 F.3d 1112, 1115 (9th Cir. 2004).  The public and the Court have a strong interest in judicial efficiency and the prompt resolution of cases.  Defendants' willful spoliation of evidence and the resulting need to resolve the instant motion for sanctions weigh in favor of default judgment.  The fourth factor – the public policy in favor of deciding cases on the merits – weighs against a terminating sanction.  Id.  However, the fourth factor alone does not outweigh the others when determining terminating sanctions.  See Rio Properties, Inc. v. Rio Int'l Interlink, 284 F.3d 1007, 1022 (9th Cir. 2002) ("While the public policy favoring disposition of cases on their merits weighs against default judgment, that single factor is not enough to preclude imposition of this sanction when the other four factors weigh in its favor.").

The third factor looks at the risk of prejudice.  Prejudice to the moving party exists if the non-moving party's discovery abuses "impair the [moving party's] ability to go to trial or threaten to interfere with the rightful decision of the case."  In re Phenylpropanolamine (PPA) Prods. Liab. Litig., 460 F.3d 1217, 1227 (9th Cir. 2006).

As a result of the spoliation, InternMatch is unable to verify the genuineness of

19

Nxtbigthing's evidence of use documents.  InternMatch argues that this is the only documentary

proof of Defendant's use of the INTERNMATCH mark pre-dating InternMatch's use.  ECF No.

63 at 11–12.  Without access to the electronic versions of these documents, InternMatch cannot

determine the date the files were created, the history of the modifications made to the files, and

other relevant information.  InternMatch is unable to test their claim that the documents were

"concocted by Mr. Batterman on behalf of Nxtbigthing" without these electronic files.  See ECF

No. 1 ¶ 30.  Defendants' spoliation has prejudiced InternMatch by impairing its ability to attack

Defendants' claims of prior use at trial.  See Leon, 464 F.3d at 960 (concluding that district court

did not err in finding prejudice where one party deleted files that were obviously relevant to the

litigation).

Finally, the fifth factor looks at the availability of less drastic sanctions.  To evaluate this

factor, the Court examines: "(1) whether the district court explicitly discussed the feasibility of

less drastic sanctions and explained why such alternate sanctions would be inappropriate; (2)

whether the district court implemented alternative sanctions before ordering dismissal; and (3)

whether the district court warned the party of the possibility of dismissal before ordering

dismissal."[13]  Anheuser-Busch, Inc. v. Nat. Beverage Distributors, 69 F.3d 337, 352 (9th Cir.

1995).  InternMatch argues that a terminating sanction is the only appropriate one, "both for its

deterrent effect and to remedy the prejudice inflicted on [InternMatch] and on the court." ECF No.

63 at 26 (quoting Atl. Recording Corp. v. Howell, No. CV-06-02076-PHX-NVW, 2008 WL

4080008, at *3 (D. Ariz. Aug. 29, 2008)).

In Howell, recording companies accused the defendant of copyright infringement for

downloading their sound recordings and distributing them to other users.  Id. at *1.  Initially, the

defendant did not cooperate with the plaintiffs' requests to conduct a forensic examination of his

computer hard drive and the backups he allegedly created.  Id.  The defendant removed the

---

[13] The second and third considerations are inapplicable here because Defendants spoliated evidence before the Court had an opportunity to compel discovery or otherwise order "lesser sanctions" and before the Court had any opportunity to warn Defendants.  See Leon, 464 F.3d at 960.

program and the contents on his shared folder after receiving notice of the lawsuit.  Id.  He untruthfully testified that he created backups of his shared folder although the creation dates suggest that the "backups" were created later.  Id.  The defendant also reinstalled his computer's operating system and installed a program to permanently delete all traces of certain files on his computer.  Id. at *2.  Ultimately, the district court found that terminating sanctions were warranted because the defendant repeatedly destroyed evidence central to the factual allegations in the case. Id.  The court stressed that the defendant testified to facts that could not be disproved because he destroyed relevant evidence.  Id.  The "timing and character" of the defendant's actions show that they were deliberately calculated to conceal the truth and that he willfully destroyed evidence to deceive the court."  Id.  The court concluded without the evidence, the recording companies and the court could not examine the factual accuracy of the defendant's defenses and "made it impossible to decide the case on the merits."  Id.  Imposition of a default judgment was appropriate because "[o]ne who anticipates that compliance with discovery rules, and the resulting production of damning evidence, will produce an adverse judgment, will not likely be deterred from destroying that decisive evidence by any sanction less than the adverse judgment he (or she) is tempted to thus evade."  Id. at *3 (quoting Computer Assoc. Int'l v. Am. Fundware, Inc., 133 F.R.D. 166, 170 (D. Colo. 1990).

Howell lends some weight to InternMatch's request for terminating sanctions.  Unlike in Howell, however, the Court can still resolve this case on the merits.  InternMatch seeks declaratory relief "because it is the true owner of the INTERNMATCH trademark and its rights are prior to and supersede the rights that Defendants assert in the mark."  ECF No. 1 ¶ 7.  A federal registration is "prima facie evidence of the validity of the registered trademark."  15 U.S.C. § 1057.  InternMatch, as the party claiming ownership, must establish that it was "the first to actually use the mark in the sale of goods or services."  Sengoku Works Ltd. v. RMC Int'l, Ltd., 96 F.3d 1217, 1219 (9th Cir.) as modified, 97 F.3d 1460 (9th Cir. 1996).  After the imposition of appropriate evidentiary sanctions, InternMatch will be able argue prior use, and any prejudice to it will be largely if not entirely cured.

The Court concludes that sanctions short of entry of default are appropriate.  See In re

21

Napster, 462 F. Supp. 2d at 1077.

### 2.      Evidentiary Sanctions

InternMatch's alternative request is that, in the alternative, the Court give an adverse inference jury instruction, informing the jury that (1) Defendants destroyed evidence in bad faith and (2) the evidence Defendants destroyed and/or failed to preserve would have been favorable to InternMatch.

"[A] party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." In re Napster, 462 F. Supp. 2d at 1078 (quoting Hamilton v. Signature Flight Support Corp., No. C 05-0490, 2005 WL 3481423, at *3 (N.D. Cal. Dec. 20, 2005)).

As discussed above, the evidence before the Court satisfies these criteria.  Defendants willfully failed to preserve relevant evidence of use documents that they had a duty to preserve. InternMatch is entitled to an adverse inference instruction.  The precise wording of the instruction will be determined at trial.[14]

---

[14] Without now deciding the appropriate wording of the instruction, the Court notes that Judge Grewal recently ordered that the following adverse inference instruction be given in another spoliation case in this district:

> Samsung has failed to prevent the destruction of relevant evidence for Apple's use in this litigation.  This is known as the "spoliation of evidence."  I instruct you, as a matter of law, that Samsung failed to preserve evidence after its duty to preserve arose.  This failure resulted from its failure to perform its discovery obligations.  You also may presume that Apple has met its burden of proving the following two elements by a preponderance of the evidence: *first,* that *relevant* evidence was destroyed after the duty to preserve arose.  Evidence is relevant if it would have clarified a fact at issue in the trial and otherwise would naturally have been introduced into evidence; and *second,* the lost evidence was favorable to Apple. Whether this finding is important to you in reaching a verdict in this case is for you to decide.  You may choose to find it determinative, somewhat determinative, or not at all determinative in reaching your verdict.

1    Additionally, Defendants are precluded from offering argument and testimony that the

2    destroyed evidence, or any versions of it in hard copy or otherwise, supports Defendants'

3    assertions that they have priority to the trademark.  To permit otherwise would unfairly prejudice

4    InternMatch.  See id. at 1077.

5            **3.    Attorneys' Fees**

6            Under its inherent powers, "a district court may also award sanctions in the form of

7    attorneys' fees against a party or counsel who acts 'in bad faith, vexatiously, wantonly, or for

8    oppressive reasons.'"  Leon, 464 F.3d at 961 (quoting Primus Auto. Fin. Servs., Inc. v. Batarse,

9    115 F.3d 644, 648 (9th Cir. 1997).  The court must make an express finding that the sanctioned

10   party's behavior "constituted or was tantamount to bad faith."  Id. (quoting Primus Auto, 115 F.3d

11   at 648.

12           The Court finds that monetary sanctions are warranted here.  As a result of Defendants'

13   bad faith conduct, InternMatch was forced to spend substantial resources investigating

14   Defendants' spoliation.  Accordingly, InternMatch is entitled to the attorneys' fees associated with

15   bringing the Motion for Terminating Sanctions.  Within 30 days of this Order, InternMatch is

16   ordered to submit a request for a specific amount of fees, with evidentiary support, for the Court's

17   consideration.  The Court will determine a reasonable award "in light of the degree of

18   [Defendants'] culpability."  In re Napster, 462 F. Supp. 2d at 1078.  If Defendants object to the

19   reasonableness of the fees claimed, they may submit an opposition within 15 days of

20   InternMatch's request.[15]  If Defendants file an opposition, InternMatch may file a reply within

21   seven days.

22           The Court declines to award attorneys' fees, under 15 U.S.C. § 1117, incurred in the

23   litigation as a whole.

24   / / /

25   / / /

26

27   Apple Inc. v. Samsung Elecs. Co., 881 F. Supp. 2d 1132, 1151 (N.D. Cal. 2012).

28   [15] Given Nxtbigthing's filing history, the Court reminds it that the Court may choose to disregard
     an untimely opposition.

United States District Court
Northern District of California

23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**CONCLUSION**

For the reasons stated above, the Court hereby denies InternMatch's Motion to the extent InternMatch seeks default sanctions, and grants InternMatch's Motion to the extent InternMatch seeks a preclusion order, an adverse inference instruction, and attorneys' fees.

IT IS SO ORDERED.

Dated: February 8, 2016

_____
JON S. TIGAR
United States District Judge

# EXHIBIT B

**Ramallo, Oscar**

| | |
|---|---|
| **From:** | Credit Match <creditmatch12@gmail.com> |
| **Sent:** | Monday, November 05, 2018 12:38 PM |
| **To:** | Ramallo, Oscar |
| **Subject:** | Re: CREDITMATCH Trademark |

Mr. Ramallo,

We have no interest to sell the trademark, however I was willing as a professional courtesy to entertain your call last week to discuss your email regarding the purchase of our trademark CREDITMATCH. Unfortunately you and your clients bully tactics will not work and we do not wish to engage in further communication when your client has no serious intent with their proposed low offer to purchase our mark. During our call last week you had all of your alleged facts incorrect and I forwarded you the accurate appellate court order to confirm. Furthermore on that same call, numbers were discussed, which clearly you client decided to disregard. You have no basis to continue to state that we have no legitimate rights to our mark, it is simply attorney rhetoric. Our insurance company has been placed on notice of your clients intent and threats and as such we are prepared to defend our valid trademark. You clearly have not done your research regarding our mark use in interstate commerce. As discussed on our call, if your client begins using our federally registered trademark we will seek injunctive relief as well as damages and attorney fees for your clients clear bad faith use of our mark.

Have a nice rest of your day.

Thank you,

Chad Batterman

On Mon, Nov 5, 2018 at 3:21 PM Ramallo, Oscar <Oscar.Ramallo@arnoldporter.com> wrote:

Chad,

Following up on our conversation last week, I have been authorized to offer $2,500 to purchase CREDITMATCH. Although we don't believe you have any legitimate rights in this mark, we understand this amount is sufficient for you to make a profit after recovering your filing fees and other costs. I look forward to your response.

Thank you,

_____

Oscar Ramallo
Associate

Arnold & Porter
777 South Figueroa Street | 44th Floor
Los Angeles, CA 90017-5844

1

T: +1 213.243.4290 | F: +1 213.243.4199
Oscar.Ramallo@arnoldporter.com | www.arnoldporter.com

**From:** Credit Match [mailto:creditmatch12@gmail.com]
**Sent:** Thursday, November 01, 2018 2:49 PM
**To:** Ramallo, Oscar
**Subject:** Re: CREDITMATCH Trademark

Mr. Ramallo,

Does now work to speak?

Thank you,

Chad Batterman

On Thu, Nov 1, 2018 at 4:32 PM Ramallo, Oscar <Oscar.Ramallo@arnoldporter.com> wrote:

Is it possible to push back our call to 2:45 pacific / 5:45 eastern?  I am available any time after that as well.

**From:** Credit Match [mailto:creditmatch12@gmail.com]
**Sent:** Tuesday, October 30, 2018 4:00 PM
**To:** Ramallo, Oscar
**Subject:** Re: CREDITMATCH Trademark

Mr. Ramallo,

I will contact you then.

Thank you,

Chad Batterman

On Tue, Oct 30, 2018 at 6:57 PM Ramallo, Oscar <Oscar.Ramallo@arnoldporter.com> wrote:

5 pm eastern works for me.  Please call me at 213-243-4290.  Thank you.

**From:** Credit Match [mailto:creditmatch12@gmail.com]
**Sent:** Tuesday, October 30, 2018 3:55 PM
**To:** Ramallo, Oscar
**Subject:** Re: CREDITMATCH Trademark

Mr. Ramallo,

I will not be available until 5pm est on Thursday.  Will that work for you?  What's the best number to reach you?

Thank you,

Chad Batterman

On Tue, Oct 30, 2018 at 6:53 PM Ramallo, Oscar <Oscar.Ramallo@arnoldporter.com> wrote:

Are you available Thursday at 10:00 am pacific time?

**From:** Credit Match [mailto:creditmatch12@gmail.com]
**Sent:** Tuesday, October 30, 2018 3:52 PM
**To:** Ramallo, Oscar
**Subject:** Re: CREDITMATCH Trademark

Mr. Ramallo,

Please let me know a time you are available to speak either today or Thursday of this week regarding your inquiry.

Thank you,

Chad Batterman


On Fri, Oct 26, 2018 at 3:38 PM Ramallo, Oscar <Oscar.Ramallo@arnoldporter.com> wrote:

Dear Mr. Batterman,


Our firm represents ConsumerInfo.com, Inc. ("ConsumerInfo").  ConsumerInfo seeks to register the trademark CreditMatch.


We are aware of the Digital Receipts, LLC ("Digital Receipts") registration for the trademark CREDITMATCH.  We are also aware of the numerous TTAB and federal litigation in which it has been shown that Digital Receipts and a related company have obtained invalid trademark registrations by claiming rights to marks that were never in fact used in commerce.  Digital Receipts' registration of CREDITMATCH was obtained as part of the same scheme and is invalid for the same reasons as these other registrations.  Moreover, there can be no confusion with an unused mark.


Without waiver of any rights or remedies and solely to avoid the costs of litigation or other proceedings, ConsumerInfo is prepared to offer to purchase Digital Receipts claimed rights in CREDITMATCH for a nominal amount.  Please contact me to discuss ConsumerInfo' s offer.


Sincerely,


_____
Oscar Ramallo
Associate

Arnold & Porter
777 South Figueroa Street | 44th Floor
Los Angeles, CA 90017-5844
T: +1 213.243.4290 | F: +1 213.243.4199
Oscar.Ramallo@arnoldporter.com | www.arnoldporter.com


This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.